16-1412 United States Postal Service Petitioner v. Postal Regulatory Commission Mr. Belk, the petitioner. Ms. Kershnay, for the respondent. Are you guys still here? This case is about the price cut. May it please the court. Good to see you all again. I think the issue here is more basic, I hope it is, than the issue before. The issue there was essentially whether a change in a mailing requirement can change the rate for a service by essentially forcing mailers to pay more for it. The issue here is, does the price cap regulate not only the prices we charge, but the services we offer? Does it essentially regulate the portfolio of services? The commission held that it did, and we think they're wrong both on a statutory basis and for arbitrary and capricious reasons. The statutory argument is that there are two different sections of the statute. One regulates rates and one regulates our product list. The commission treated this as a product list change, but it alone suggests, or strongly suggests, that Congress did not view a change in rates as synonymous with a change to the menu of services, the portfolio of services. Not synonymous, but it's hard for me to see that Congress made the two mutually exclusive. And I think that's in the 2015 opinion. That they are or they are not? Not mutually exclusive. You could have a product change and then it leads to a price change. Yeah, I mean, I think that the 2015 opinion didn't speak of product changes. It spoke of requirements for rates within a product. So I think that a product change, a change to the list of market-dominant products, or the composition of our services, I didn't see anything in that opinion that suggests that the price cap should apply to that. Because, I mean, in the earlier case, the barcode case, we weren't changing the nature of the service we were offering. We were just changing what you needed to do to get it. The underlying service was the same. Here we're saying we're not charging you more for it. We're not making you do something different to get it. We're saying we don't want to offer it anymore. And that, to me, does not sound like a rate change. That sounds like a request to the commission, which, you know, again, we didn't do this unilaterally. We requested the commission. We want to change the product list. We want to get rid of the service. We don't want to offer it anymore. The commission analyzed that, said, yep, good reasons to get rid of it, and then said, but you, of course, are going to have to pay for it in the form of a price increase. And that leads to the sort of the second bucket of arguments, that even if the statute didn't foreclose treating change to the nature, to the array of services we offer as price changes, there's sort of a lack of reasoned decision-making here. I mean, the most obvious one is that, you know, a regulator generally has to treat like cases alike, and the commission has never before, that we know of, I don't know, I'm sure, has not treated other changes to the product list as also rate changes. The postal service deleted COD to the home, right? We didn't propose deleting it. Oh, you mean to the home, right? We proposed offering to changing what essentially the parameters of what we were offering were. So there hadn't been an earlier COD service at the post office? Oh, no, there hadn't. I mean, what our proposal was, was to change. It was collect on delivery. It was the service where essentially instead of, I mean, you know what the idea is, that the recipient of the product has to pay. Right, right. You know, we collect the payment and bring it to the center. Right, right. The change we were proposing making to that was, rather than have the recipient be able to get that piece of mail at their home and pay their letter carrier the amount, they had to go to the post office. And I think there was some risk. So there had not been, before the proposed change, any service at the post office with perhaps a different price? No, it was the same. No, there wasn't a different service with the same price. We were charging the same price and altering essentially what you got for it. I mean, the argument was, or the reason we did that is there was some fear of theft with our letter carriers. Yeah, yeah, yeah. And so we wanted to just change it. In our view, that was a reasonable change to a product definition. It wasn't a rate change because we weren't charging a different price. And the commission, I think, agreed with that, that it wasn't a rate issue. It was just the nature of what you're offering issue. And you went ahead with that and that was reviewed under the review? We ultimately didn't go ahead with that because I think the commission deferred sort of the question of whether, sort of the regulatory issue of changing. I can't remember exactly how it came out, but we ultimately didn't go forward with it. But, again, it wasn't a rate issue. This is different than that, though. This isn't a we want to tweak what we offer. I mean, this is we offer a range of ancillary add-on services, and we didn't want to provide this one anymore on the ground that it had fallen into disuse. It was sort of confusingly similar to other products that we offer. And now they're coming back and saying, yes, it is a rate change because you have certified mail with a physical return receipt. Yeah, and those are different services. I mean, the commission approved them as different services. They didn't approve them as different rates within one service. I mean, there are certainly similarities. The basic assumption that they're making with which you take great exception is that because there is one common feature, this is like the last case. You're forcing people into a higher rate category. That's the assumption you're saying. That assumption is not shown anywhere. First of all, they're not the same services, and there's nothing to show because they're alternatives up and down. Right. That's really the argument here, which makes it very different from the other one. They're clear services up and down, and there's one little common feature, and you're saying all we've done is just delete something, and you approved it. Right. I mean, we're saying either there are no alternatives because they're different services or there are two alternatives, one up, one down. Right. Exactly. And then we're starting out essentially saying it's not a matter of alternatives, maybe because there's one feature that's the same. I mean, it's like arguing that with all these services, you have to go to the post office, so there's a common feature. Right. Yeah, fair enough. To be fair to the commission, it seems to me their notion, as I get it, picking an alternative, assuming it's proper to go to the question of finding an alternative, is to ask if there is some service still offered, which, although it may have all kinds of wonderful stuff attached to it, enables the mailer to get exactly what he got before. And so if such a service and rate are out there, we assume that these people formally taking postcards will continue to get postcards and pay for all these bells and whistles. Right? Yeah. I mean, I think that that... And where they get that, I don't know. Yeah, I think you have two different things there, but I think the good news is that under 3642, that's exactly the type of inquiry that the commission engages in. Right? I mean, the statute requires in determining whether we can eliminate a service, add a service, to consider the views of users of the mail. So the commission can target its inquiry into exactly that kind of question, that if purchasers of return receipt for merchandise came back, and we propose this, right? We can't do this unilaterally. We propose it to the commission, and if users of the mail say it came, or users of this service say, oh, you know, this isn't really fair to us, because the only reason we like this service is because of this one feature. And to get that one feature, we now have to buy up to something else. That is an argument in favor of denying the request, right? I mean, but having granted the request, having said, no, no, no, there are good reasons to get rid of this, it's odd that they then treat it as a price cap issue, because the price cap really isn't designed to protect the users of this service. It's a cap on our, essentially, our prices. The, what was I going to say? Oh, yeah, I mean, just back to the matter of being consistent, that the, if the commission hasn't treated the addition of a new service as a rate change, or the transfer of a service, which is essentially just eliminating it from the market dominant list and adding a parallel new service to the competitive list, it's unexplained why it would treat the removal of a service from the menu as a rate change. And it's especially odd that they would apply a test that they developed specifically for mail preparation changes, which deal, which we can generally do unilaterally, otherwise, why they analyze sort of a request to the commission to remove a service as that. But I think the, one other question about the, or one other point about the alternatives. As we say, they're either zero because they're different services, or they're two. I mean, the commission should at least consider the fact that the reason that this particular service we want to get rid of has fallen into disuse is people are buying down. So whatever features the commission thinks are, you know, make it facially more analogous, the market sees the lower, the less expensive one as potentially the clearest alternative. But the point is there. Well, but does that matter in our disposition? It shouldn't, because that's actually the second. Should or should not? Should or should not? Because step one is, is it a rate change? It's only when you say there's a rate change do you get to step two of what effect is it. And step two should have been, as the commission said in the earlier case, that once you get to that step, you generally hold mailer behavior constant. Had they done that, they would not have said, they instead guessed what mailers will do if they couldn't get this service anymore. But I think our fundamental point is that this is not a change in rates in the first place. It's just a change to our menu of offerings that's separately analyzed under Section 3642. If the Court doesn't have any further questions, I can, I hope, just return on rebuttal. Okay. I'll give you some time on rebuttal. Could I start out by asking you whether you agree with Mr. Bell that once you have one of these rulings and assuming the Postal Service goes ahead with the change, and I think it applies across both cases, forever and ever, well, of course, there's another world. I mean, you know, that's what Congress will do and so forth. Forever and ever, there's a phantom income imputed to the Postal Service through every piece of mail that is going under, that has been theoretically shifted to this higher-priced service. I'm glad you asked that question, Your Honor, because, no, that's not correct. That's not the Commission's position. What it's doing when it figures out the rate change is looking at the price of sending the same mail last year and this year. So that mail is reallocated in the first year, and then in the next year there's no more reallocation to be done. We've sort of gotten rid of that price. So if you think about, say, there are ten pieces of mail, obviously not the real number, going by the return receipt mail last year, and those pieces of mail are all going to be treated as certified mail, as return receipt, and so it's something like, you know, an extra $1.50 or $15. Next year, when we look at the price of sending last year's mail this year, there won't be any mail coming in as return receipt mail because that has been eliminated. So all of the mail is either already going to be coming in as signature, the electronic signature confirmation, or a certified delivery with return receipt. So the effect only lasts one year. You're saying if the service's prediction is correct, the phantom revenue lasts only for one year. That's right, Your Honor. But, of course, this is a price calculation, so it's not actually calculating the revenue. It's calculating the price. The change in price. The change in price. Only the incremental change in price. That's right. So the difference between the same mail last year and this year. Right, right. So it'll just wash out. I mean, either way, whether they're right or whether they're wrong, it's just been counted once in that one year, and it may have been counted radically wrong, but it's just one year, and it's over. That's right, Your Honor. And does it affect the baseline for the following year? Does the assumption, the historical volume assumption that was made, for example, if here we think all the people who got return receipt for merchandise, the assumption is they're all going to go for certified mail. And if that, right, with a return receipt. We're not making assumptions about what people will do, but we reallocate that mail. The treatment is to treat that as everybody's going to do that, just formally based on what they did before, same service, certified mail with return receipt. Does that have any legacy effect on the way the price cap is applied going forward? No. So the next year we would look at the mail that came in in that next year, where there is no return receipt mail because that's been eliminated, and we would look at how much it would cost to send that mail last year and how much it sent that mail the next year. So the return receipt mail would be completely gone because no return receipt mail would come in in the next year. Is my answer — And if the Post Office is right in saying that everyone goes to the much cheaper product, all the former return receipt people, everything's fine for the second year. But in the year in question, the Post Office is barred from potential rate increases that might well fit within the rate cap if its view were taken. So if in year one, when it gets rid of return receipt mail, it uses its rate cap space to get rid of return receipt mail, then it can't raise other rates in the category. The category as a whole has to fit within the rate of inflation. But, of course, if there's a service like this one where there are declining volumes, the amount of rate cap that it would take to make the change goes down and down. So if only a few people are using return receipt mail, it doesn't take very much rate cap to get rid of it. But for those people who continue to use it, if they go to the Post Office and they say, I want that postcard— We're going to assume that they're going forward. But when you say that the overtime effects—it's a little bit confusing, I think, the way we're talking— you're positing there are different times at which this one-time event might occur. If it occurs when the change has already largely taken place, then the elimination of the service is going to be cheaper in rate cap terms than if this one-time, one-expense, one-year use of price cap authority is done earlier. It's a bigger dislocation to the public, says the Commission, and it's also going to cost them more of the price cap. But either way, it doesn't matter whether, after it's done, it doesn't matter whether the Commission was right or wrong in assuming that the people who used to get RRM are going to go to certified mail-with-return receipt or not. It just doesn't matter because it's done. It was treated that way. And there's no legacy effect of whether that was right or wrong on the price cap. Right, so maybe some of those people will go to certified mail-with-return receipt, and then the next year, the volume for certified mail-with-return receipt will be a little higher. And we don't even care what that volume is until there's a different change in that service category. And then we sort of reactivate and say, okay, what is the historical volume in each subpart of the service category to calculate the price cap so we can apply it to the new change? So the only time the actual effect of what mailers do in response to the elimination of a service matters is sometime down the road, maybe it's the very next year, when a new price cap is being calculated and the volume is being allocated to different services. Right? Whatever your answer is, I'm lost. I'm totally lost. I'm a little worried about answering for that reason. Because if the effect on the price cap is essentially nothing, then I don't know why you're pushing it. Obviously, there's an impact that's a moment to you. I take you to be saying that there's impact in year one. Period. Period. Full stop. Right. And then the following year, there is no mail in the return receipt category, so there's nothing to reallocate, and we stop thinking about the question entirely. Yeah, but the question, they have asserted that that impact continues. They're locked in. We'll hear from them on rebuttal on that. But in any event, I don't know how, whatever the consequences, it's based on an assumption that's not proven. So it's not an assumption. It's the same thing that we were doing last time where we take the historical volume. We say if somebody asked for the postcard with the signature on it last year. You do it by this rigid practice of saying that if the alternatives are, suppose B is dropped out, we have A and C. And A is very similar and low price, but not completely similar. It doesn't get the mailer everything he wanted. Compare that with C, which has everything the B mailers got before, plus the moon. We assume they all go to C. Right? That is what, as I understand it, and it's the closest I've come to an articulation of this, is footnote 25 and its docket R2017-1. And I'm not sure what it is because I've only printed out the page with the footnote, but it seems to come as close as anything to stating a rule on this without any justification for it. So I think the best statement of it might be going back to that 2007 rulemaking where we decided that this was the way we were going to calculate changes in rates and the Postal Service's submission then, page 8, footnote 5. For other purposes, it may be useful to estimate what the volume proportions might be after rate distinctions are introduced and mailers respond to the new price incentives, but that exercise should not be confused with the augmentation of historical billing rates. I'm sorry, this is very technical. For purposes of calculating compliance with the rate cap. So what the Postal Service said initially and what we do because we cannot make predictions. Some people will pay more, some people will pay less. We don't know what the numbers will be, and we can't figure that out in the 45 days. Commission can't figure that out in the 45 days that Congress gave them. So what the commission does is it just says, if last year you went to the counter and said, I want to send this so I get the postcard with the original signature, you would pay for return receipt mail. Next year, I want to send it so I get the postcard with the original signature, you pay for certified mail with return receipt. Now, people are going to make different choices in response to the cost incentives, but we don't know what those choices are going to be. And so this is entirely consistent with our regulatory scheme. We can't predict that. Could you just clarify my thinking on sort of seasonality of all this? Is there a particular time where the service, where the issue of the size of the rate cap and its computation is before the commission, or the 45 days starts running and then it ends and so forth? So there is a process every year where the 45 days starts running. I don't know exactly how that's set up, but I believe it starts with the Postal Service coming in and making its proposal for the next year, and then the commission gets responses and there's a briefing. It can ask the Postal Service questions. There's a back and forth. But that whole process— And everything goes into effect January 1 of the following year? I believe that everything goes into effect January 1 of the following year, but I'm not 100 percent sure about the exact time. What I do know is that Congress, in the statute, gave the commission 45 days to make this determination. I wonder if you attach much importance to that. So basically it's kind of like an annual budgeting. Every year there's sort of these issues about price and application of price cap with all the different changes that the Postal Service wants to make are looked at. Right. And so when the commission— On January 36, 22 announced. Exactly. And when the commission's predecessor used to make predictions about how people would respond to incentives, that took, I think, 10 months to go through this whole process. They had expert witnesses. It was a big thing. The commission says we can't, at the Postal Service's recommendation, we can't go through this whole process in the 45 days. We just need a straightforward answer, and our straightforward answer— All those complications developed in the context of indisputably rate changes, right? Yes, Your Honor. So 3642 tells us which product is on which list. If it's on the market-dominant list, 3622 applies. That's the system for regulating rates and classes for market-dominant products. So anything that's on the market-dominant list, that system for figuring out the rate is going to apply to it. So this is really different from the situation in which we move something off of the market-dominant list or the commission moves something off the market-dominant list onto the competitive list, right? If something is moved onto the competitive product list, the market regulates the price and keeps the price from being too high. But anything that is on the market-dominant list, on that list of products for which the Postal Service has a monopoly, those products are under the 3622 regulation. And again— You've never done this before, as I understand it. Your precedent just doesn't support this, where you have approved the removal of a service from the list. You've never engaged in rate cap analysis before? We haven't had— You're trying to keep—you have had similar situations before. You've never treated it this way before. And you're trying to treat this case like you were arguing the other case, based on an assumption that, well, they're really pushing people out of one because they have to go to another. That assumption isn't even supported. But in any event, you've never done this before, where you have approved under a statutory provision that allows you to approve the removal of a service. You've never engaged in rate cap analysis before. Not that I can find. From the beginning, the regulation has required the Postal Service to address the rate cap effects. That's 302023B. There has not been a case like this where there is an alternative. But the Postal Service— Well, but that's the assumption. And the assumption is just, at least as far as I can see, the assumption is just not really supported in this case, where there's an alternative. Of course, there are all kinds of alternatives in the Postal Service. You can always say there's a service that looks like the one that's been completely removed, and so we're going to assume that you've deleted one and are pushing people to that service, which is higher priced. That just doesn't work here. They're completely different services. They have one little overlapping feature. But you—I can't—you merely asserted a fact that is not supported. It's supported by the Postal Service's submission at JA138, where they tell us that certified mail-with-return receipt is the alternative rate cell. It seemed to me it's not altogether clear from that that the document reported to address the rate change issue, and it certainly is something which is rejected by the Postal Service's response to the—whatever it is, the public— Right, and JA173 to 74, Postal Service says, oh, that's not what we meant. Once it becomes clear that that's how you're taking it, no, that's not what we meant. But there is an alternative rate cell, right? There is—you can still go to the counter and say, I want to send this so I get that postcard with the original signature. So you're assuming—you're packing the answer into the question. What if you come in and say, I just want delivery confirmation? That—I mean, you're assuming something. It's a factual matter. You come and say, I just want delivery confirmation. Oh, yeah, I can do it by email now? Great. That's what I want, right? And so it's sort of like—I mean, to me, I keep thinking about this as like the side order case. If you always go to Medium Rare and you say, I want an order of French fries, and all the teenage kids from the neighborhood go there, and the restaurant says, no, we want to upgrade. We don't want those teenage kids coming in for the French fries after school. So we're going to say, we don't serve a side of French fries. We only have the steak, tenderloin steak, with fries on the side. And you wouldn't say—you didn't eliminate—you know, you eliminated the side order of French fries. The side order of French fries eliminated, right? Oh, no, French fries are still there next to the steak. It depends on how you describe it, right? And you're trying to say that they are still offering the French fries because they're on the side of the steak. I'm saying that for the people who only want the French fries, if they really want the French fries, they have to pay more, right? So for the people who really want the postcard, they have to pay more. Now, the Postal Service can help. But there's a contextual assumption in that, that there wasn't in your use of the similar analysis in the last case, at least, that what if I'm coming in and saying, I just want to know when it gets there, because I don't want them claiming that it got lost when it didn't. I just want to know when it gets there. I don't need a physical document. I hate physical documents, right? But you're assuming that's not the person. Yeah, you're making a factual assumption that's just not supported. You're assuming something in the heads of these users that may or may not be right. Well, of course, the Postal Service can try to move people off of return receipt mail by having the people at the desk say, do you know for $2 less you can get electronic confirmation? And they can do that, and I believe they have already done that, right? It doesn't do any good in the first year. Well, so they would have to do that in year zero? So they do that, and they've already been doing that, which is why the volume is declining. So if they do that in year zero and everybody says, ooh, I want the electronic one, then the price cap effect of getting rid of return receipt mail starts to report zero because nobody's actually using it. The people who are left here are the people who are saying, nope, I want that physical postcard. Now, maybe if they have the choice of still paying even more for the physical postcard, they won't buy it. But that gets into the kind of predictions that we can't make in 45 days. The people who are here are the people who have said, I want the physical postcard, or who have not been given the information about the different rates. But the Postal Service has the ability to make this change, to encourage people to make the change, by giving them the information that they can pay less and send their mail by a different rate. I see that I'm out of time. I'm happy to answer any additional questions. Thank you very much. Thank you. We'll give Mr. Belt a couple minutes on rebuttal. I don't know who these people are. There were no people, and that's part of the problem here. There were no people that came forward and said the only reason I use this service is to get this postcard. And it's also sort of odd that the theory is that the Postal Service has been driving down the volume of this service by encouraging people to buy a less expensive service, which we don't get any credit for, by the way, in terms of the price cap. It's not considered a reduction. We've been doing that as part of some odd long con that at the end, when there are only a couple people left, we're going to hit them with the right price increase. Why have we been encouraging everybody to buy down? It really truly doesn't make any sense. The fact is there are two alternatives, or no alternatives. Look either way. There's no finding that the only reason the people here use this service is to get the feature that's only available for the more expensive service. The Commission, in fact, is engaging in speculation. They are projecting why they think mailers are using that, which is exactly the opposite of what they said they did. That's slightly unfair because what they are saying is not that we'll engage in speculation. We will simply remove this issue from the calculus. No matter what the truth, we will go ahead and count this revenue as if it were received. Right? That's not speculation. It's just an order. I suppose. I mean, I think it's speculation. It's them saying we don't know if people will buy up or buy down, so we'll say they'll buy up. I mean, I don't see how that's not speculation. We don't know why they're buying. They're choosing. I think the point is just that they're choosing that rule so that no speculation is involved. It's a formal rule. It's just a fiat. It's just like this is the default rule. We're doing it. It's the opposite, though, in some ways, of the rule they rely on in the other case. The other case says no change in mailer behavior. We're just going to sign this bond. Right, and here they're saying all I want. Here they're saying, well, we're going to make the choice for them. We're going to assume a change in mailer behavior, and this is the choice they'll make. Right. I mean, I don't see how that's consistent. They're no longer ordering the side order. They're ordering French fries wherever they come, whereas if you're really rigid about wanting the same thing, it's wanting only the postcard. And there's just, again, no finding on that. Was Commission Counsel correct in saying that the phantom revenue is counted against the Postal Service only for the year immediately following this event? No. Actually, it continues on until a further change is made, as I understand it. Maybe we're answering slightly different questions, or I'm not understanding the question. The way I'm thinking of it is we assume for whatever we're doing, that say there were ten pieces that are in question, and we're going to assume they're all going to spend more rather than less. For year one, they assigned the price cap hit accordingly. If in year two we came to them and said, actually, you were wrong about that, it's here. We don't get credit back. It continues on. You don't get credit back, but you only had to pay one time. So this is the story. I think that what they're saying is right or wrong is an empirical matter. We are going to charge you as if it were the case that everyone's going to do the certified mail. And it's going to cost you more if you do this when not that many people have shifted. It's going to cost you less if people aren't even wanting to do the RRM. But we're going to charge you once. And the price cap is only looking at the increment change in price, I think. And therefore, the following year, there's no increment change until some other product is being, some other price is being changed. And then you don't look back, you know, three years. You look at only the preceding year. So it's just washed away whatever happened, right or wrong, accurate or not. When the RRM was dropped, now you've got a new array of actual behavior, and that involves maybe, if you're right, a minuscule amount of certified mail and a lot of, you know, electronic signature. And that becomes the baseline. So you don't get it back, but you also don't keep, there's no legacy effect within the price cap. You have to pay, pay, pay. Well, but I think in a way there's. Weren't you arguing that there was, that amount is not insignificant even if it's a year? Yeah. Oh, sure. Sure. Absolutely. But on top of that, I think there's. You can't minimize that this is a business, and that's a lot of money. Yeah. And I think there is a legacy effect, at least in the following sense. I mean, I think it's, I think what you said, I'm not sure I agree with. I'm tired. But the. No. I can't imagine why. But there is one aspect that I think I do disagree with, where there's no legacy effect.  we're going to impute to you the revenue you would have gotten had everyone bought up, right? So that counts against us. It's a revenue, but if in reality we didn't get it, in fact people bought down. So we lose revenue in reality. We get imputed revenue and then effectively lose revenue also in reality. And let's say in year two we choose to raise the price of signature confirmation. We kind of get hit harder there because this revenue, the shadow revenue that went up, now they're looking at real volume that went down, and we get charged again. Do you know what I'm saying? And so in that sense, certainly in that sense, there's a legacy effect. Well, you're saying there's a one-way ratchet because when you save money, you don't get credit against a price cap. When you're charged as if you're getting revenue, you do pay for it. But that's sort of, it's not so much legacy effect as it's this, the asymmetry of the way the price cap accounts for supposed price rises but not, as you say, discounts. Right. I think that's, certainly that's fair to say. And I think that's, we're not claiming, for example, price cap credit for efforts to encourage mailers for signature confirmation. We're trying to encourage them to use a more, you know, a product that would have more value to them to make us a more attractive provider of services. Right. So we have benefits, but it's not a price cap. We're not claiming, oh, that's a price reduction. And actually in some ways this is very similar to intelligent mail. The commission should be very careful in treating things as price cap issues because we really can't get that back. You know, so that's why in some respects these cases, why they're both important to us, is that the commission is sort of treating everything it sees as a potential price increase when it should be. And there's a potential bad incentive effect on you to avoid creation of cheap alternatives. Oh, absolutely. In fact, it's odd, too, because in this particular case, with the return receipt case, the commission specifically said there is not only, it's not only good, but there is a need to get rid of what they called, how did they put it? But a need to get rid of services that are, where does it say that? But anyway, there's a need to get rid of services that are outmoded. Sort of cluttering the menu. There's actually, it's good. It's an actual good to simplify things. And yet they're essentially telling us, but we don't, you know, what is the point of applying the price cap here if they think it's good? Do you have a figure on what this costs under its service category price cap? It wasn't much, I mean, in this particular case. But it was not nothing. I think it was $323,000 a year. So, obviously, pales in comparison to the $368 million that they are imputing to us under the barcode rule. And the potential literally tens, if not tens of billions of dollars, that their analysis that council advanced today, where literally every mail preparation change is considered against the cap, that would be, I mean, that would probably be, that would probably be a fail to the Postal Service. I think it said $1.2 billion for the barcode. Sorry, it's $368 million now based on that 12%. Did I say $1.2 billion? But at the beginning, was it $1.2 billion? It was $1.2 billion a year. So the passage of time, refraining from doing it has made it cheaper. Correct. Because now, when we first came to the commission at that time, had already complied voluntarily. And they said, okay, well, essentially, if the other 36% don't, it would be $1.2 billion of revenue a year they would pay us. But, of course, we will never get that, which was proven two years later, when we came back to them and said, okay, well, now, two-thirds of that money you said we were going to get every year is clearly not happening because these people have voluntarily complied. At that point, you would think the commission would have said, oh, maybe this isn't that big a deal. You know, maybe the mailers are equipped to handle this. This is actually not that big of a change. But instead, they said, well, the last 12%, they won't comply. And the effect of that would be $368 million. And when I say the legacy effect, that really is $368 million they assumed we would get every year going forward in the form of people not complying, when, in fact, they actually did comply. I mean, assuming we had gone forward with this, we couldn't because we can't afford taking a $368 million, let alone a $1.2 billion annual price cap hit. If it was just about us trying to get revenue, we'll just do that through pricing. We're certainly not going to take a cap hit based on revenue we're never going to see. And those figures are in the record, the $323,000 a year? That's in the record. One of our comments below, there were very few comments in the return receipt case. Right. Yeah. The commission just came out with the order. As for the $368 billion, that's explained in our brief. The $1.2 billion was in the record, and we illustrated in our comments below how you could back out now $700-something million based on the people who have since complied voluntarily. Got it. And I don't think there's any dispute over any of those numbers. Not to change the subject, but if you all go down to our cafeteria now for lunch and you want French fries, you have to get a blueberry muffin with it. All right. The thing is, you don't know why I wanted French fries. Thank you very much, Your Honor. Thank you for the extra time as well. We ask, of course, that both cases be remanded for a standard. Part of the problem here is we have no idea what's expected of us under these rules. I thought you were asking in the RRM case, not necessarily for a remand. No, that one we want. It's a statutory argument. It's a statutory argument. Right. For RRM, we're saying that when you want to get rid of a service, you're not changing the price you're charging for it. And in the other case, remand with vacature or without vacature? There's no need for vacature because they essentially prevent us from going forward because we essentially go back again for a clear standard. And also one that answers the relevant question, that is driven to the relevant question, which is if it's going to be a price gap hit, then the analysis has to be whether essentially the costs of compliance exceed or don't exceed the price you pay by not complying. I guess there's no such thing as a remand with vacature in the first case because then the case is no longer locked. I mean, the commission can do whatever it wants rule-wise. Right. And I think they will and should. But let's say we say, you know, for this done. Anyway. I mean, I don't know. I hope there's a vehicle for vacature because, you know, I don't want to come back here two years from now saying, again, they were giving us a standard that leaves us completely in the dark. All right. Thank you all very much. Case is submitted.
judges: Pillard, Edwards, Williams